*Decisions will be entered under Rule 50.*

SOCIETY BRAND CLOTHES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 28122.    Promulgated May 13, 1952.

*Ben W. Heineman, Esq., Max Swiren, Esq.*, and *Joseph D. Block, Esq.*, for the petitioner.

*William Schwerdtfeger, Esq.*, for the respondent.

306

312

314

OPINION.

BLACK, *Judge:* As has been mentioned in our preliminary statement, four issues are presented in this proceeding.

The first issue relates to the transaction whereby petitioner sold 24,000 shares of its treasury common stock in December 1943, to Raye Decker for $195,260.66 under the terms of an option. On its tax returns for the taxable year petitioner reported no income from the transaction, but on brief it concedes that a taxable long term capital gain of $61,822.11 was realized.[1] In the deficiency notice respondent determined that petitioner realized a long term capital gain of

---

[1] Instead of including the amount of $61,822.11 in its net income for the fiscal year, petitioner credited its capital surplus by that amount. The credit to capital surplus, which petitioner now concedes to be the amount of the gain, was computed by petitioner as follows:

| | |
|---|---|
| Cash received from Mrs. Decker | $195,260.66 |
| Unpaid balance of indebtedness of Alfred Decker | 133,438.55 |
| Difference—credited to capital surplus | 61,822.11 |

$192,908.85, but in his brief respondent computes the long term capital gain to be $166,185.66.[2]

Hence, the question is whether the long term capital gain which resulted from the sale of the stock in 1944 amounted to $61,822.11 or $166,185.66, and this question, in turn, depends upon whether the basis of the capital asset is $133,438.55 as contended by petitioner, or $29,075 as determined and contended by respondent.

We think petitioner's contention must be sustained. It seems to us that the acquiring of the 24,000 shares of petitioner's common stock, the granting of the 10-year option to Raye Decker and the release of Alfred Decker from the indebtedness which he owed petitioner, including the $15,075 which petitioner paid the Continental Bank when it took over the 10,000 shares of stock, must all be treated as one integrated transaction. If the shares of stock, encumbered as they were by the 10-year option, had an ascertainable fair market value at the time they were received in the cancelation of Alfred Decker's indebtedness to petitioner, then the transaction was one by which petitioner collected its debt against Alfred Decker to the extent of the fair market value of the stock and the cost basis of the stock to petitioner thereafter was its fair market value at the time it was received. If, however, the 24,000 shares of stock, encumbered as they were by the 10-year option, had no fair market value at the time they were received, then it could not be ascertained how much of petitioner's indebtedness against Alfred Decker was collected by receipt of the stock and cost basis of the stock to petitioner was the net amount of the indebtedness of Alfred Decker which was ultimately canceled in the transaction after allowances had been made for all other collections on the account. See *Gould Securities Co.* v. *United States*, 96 F. 2d 780.

In the *Gould Securities Co.* case one corporation, Gould Storage Battery Company, owed the Gould Coupler Company, predecessor of the Gould Securities Co. on open account a debt which with interest amounted to $1,200,000. On February 15, 1915, the Battery Company issued 12,000 shares of preferred stock having a par value of $100 and a dividend rate of 6 per cent, all of which the Coupler Company took in exchange for the debt which the Battery Company owed it. Thereafter the Coupler Company, in the year when the 12,000 preferred shares in the Battery Company became worthless, claimed that

---

[2] Respondent computes the long term capital gain as follows:

| | | |
|---|---|---:|
| Proceeds from sale of 24,000 shares of stock | | $195, 260. 66 |
| Basis of 10,000 shares (cost) | $15, 075. 00 | |
| Basis of 14,000 shares (fair market value) | 14, 000. 00 | |
| Cost basis for the 24,000 shares of stock | | 29, 075. 00 |
| Long term capital gain realized | | 166, 185. 66 |

the 12,000 shares of Battery Company preferred stock which it received in cancelation of its indebtedness had no fair market value at the time it was received from Battery and hence the cost basis of the 12,000 shares of preferred stock to Coupler was the amount of $1,200,000. The Government on its part contended that the cost basis to Coupler was not $1,200,000 as it claimed but instead was only $815,535.39 which the Commissioner determined to be the fair market value of the 12,000 shares of Battery when Coupler Company acquired them on February 28, 1915. In dealing with the issue thus raised between the parties the court said:

It is undisputed that, if the cost basis to be given the preferred shares is $1,200,000, the admitted cost to the appellee of what it exchanged for them, the judgment below was right. And it is also undisputed that, if the shares had a fair market value when acquired in the amount for which the government contends, the appellee may not recover anything in this suit. And so the first issue on this appeal is whether or not these shares had a fair market value when they were acquired by the taxpayer. If that goes against the government, it is not only the first but it is the decisive issue.

It needs no citation of authorities, of course, for the principle that respondent's determination in the instant case that the stock had a fair market value at the time it was received is presumed to be correct. However, there is much evidence in the record, both from petitioner's witnesses and respondent's witnesses, as to the fair market value of the shares of petitioner's common stock at the time it was received by petitioner, encumbered as it was by a 10-year option to Raye Decker to acquire. We shall not undertake in this opinion to discuss this testimony in any great detail. The substance of it is that at the time petitioner acquired these shares from Raye Decker and the Continental Bank early in 1934, the country was slowly emerging from the great depression; common stocks of the strongest and best known corporations in the United States were selling at bargain prices and there was but very little demand for common stock of corporations like petitioner which, at that time, were incurring heavy annual losses and were piling up accumulated unpaid dividends on preferred stock.

Both petitioner's and respondent's expert witnesses seemed to agree that the fair market value of petitioner's common stock at that time was $1 per share, unrestricted by any option. Shares of petitioner's common stock, unrestricted by any option, were sold on the Chicago Stock Exchange at prices between $1⅛ and $2½ per share during the month of January 1934, when the settlement agreement was entered into. However, all agreed that these prices were for a comparatively small number of shares and that the number of shares here involved could not have been marketed for a greater amount than $1 per share. The $1 per share fair market value was with reference to shares unencumbered by any option. The shares here involved were definitely

encumbered by a 10-year option as has been explained in our Findings of Fact. As we interpret the testimony of the expert witnesses, these shares, encumbered as they were by the 10-year option, had no fair market value at the time they were received or, at least, only a nominal value. During the course of the testimony of one of respondent's expert witnesses, Richard S. Cutler, the following questions were asked by respondent's counsel:

Q. My question, Mr. Cutler, is whether or not you have in your mind deter-mined what the value of, we will say, 24,000 shares of the common stock of Alfred Decker and Cohn would be subject to this option?

\* \* \* \* \* \* \*

The WITNESS: In that case, where you could not possibly hope to get delivery of the stock for ten years, it would have almost a nominal value, five cents a share, or something of that.

Q. Do you think it could be sold for that?

A. I think you probably could have gotten a speculator to put up five cents a share in that case.

Upon the strength of this testimony and other testimony in the record we have made a finding of fact under Issue 1 as follows: "The 24,000 shares of common stock received by petitioner in the foregoing transactions, restricted as they were by the option held by Raye H. Decker, had no ascertainable fair market value at the time they were received." In thus making the foregoing finding of fact we do not mean to hold that as a matter of law the restriction of the sale of stock by an option necessarily destroys its fair market value. We think whether the fair market value of stock has been destroyed by an option will depend upon what kind of stock it is and upon the kind of option which has been granted and other relevant facts and circumstances of the particular case. All that we mean to hold in the instant case is that under the evidence we have here, when petitioner received the 24,000 shares of its common stock in part settlement of the indebtedness which it held against Alfred Decker, encumbered as it was by the 10-year option described in our Findings of Fact, it had no fair market value at the time it was received. This being true, we think petitioner is correct in its contention that the cost basis of these shares to petitioner under section 113 (a), I. R. C.[3] would be the remaining portion of its debt to Alfred Decker. See *Gould Securities Co.* v. *United States*, *supra*. In that case the court concludes its opinion with the following paragraph:

Since these shares did not then have a fair market value, no profit or loss from the standpoint of taxation was realized when they were taken in exchange for the debt in 1915. Burnet v. Logan, 283 U. S. 404, \* \* \*; Helvering v.

---

[3] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; \* \* \*

Tex-Penn Oil Co., 300 U. S. 481, * * *. When they became worthless in 1924, therefore, the loss sustained was the amount of the advances which the taxpayer had cancelled in exchange for the stock. United States v. Tillinghast, * * * 69 F. 2d 718.

If the rule as to fixing the basis for taxpayers' *loss* in *Gould Securities Co.* case is as stated in that case, we fail to see why the same rule would not apply in fixing petitioner's *gain* in the instant case. Certainly, in the usual case, the basis for gain is the same as the basis for loss and we know of no reason why that rule should not apply here. We think it does apply.

On this issue we sustain petitioner.

*Issue 2—Value of Good Will Paid in for Stock.*

The second issue to be decided in this proceeding is the value of good will acquired by petitioner from its shareholders in 1919.

In computing its equity invested capital under the provisions of section 718, I. R. C., the taxpayer may include property contributed or paid in for stock or as paid-in surplus. Ordinarily such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange, but if the property was acquired by a corporation from a shareholder as paid-in surplus or from any other person as a contribution to capital prior to January 1, 1921, the basis is the fair market value of the property at the time it was paid in. Regulations 112, section 35.718–1.

Petitioner used a value of $1,400,000 for good will in the preparation of its excess profits tax returns. In computing petitioner's equity invested capital for the deficiency notice respondent used a value of $850,000 for the good will. Petitioner, on brief, for the first time contended that the fair market value of the good will was $3,428,583.74. However, it seems clear to us that the good will of Alfred Decker & Cohn partnership at the time of transfer to Alfred Decker & Cohn, Inc., had no such value as petitioner now seeks to place upon it in its brief.

It was on October 27, 1919, that petitioner acquired all the business properties, including good will, of the partnership, Alfred Decker & Cohn. Petitioner was organized to succeed the partnership, and prior to October 27, 1919, petitioner was not engaged in business. Trading in petitioner's common stock, nevertheless, was commenced on October 16, 1919, on the Chicago Stock Exchange. At the time the partnership assets were transferred to petitioner its shares of common stock were selling on the Exchange at $45. However, petitioner's common stock was being marketed by brokers during this same period at $30 per share, along with shares of petitioner's preferred stock. Under these circumstances, the fair market value of the good will is

to be determined primarily from the past earnings record of petitioner's predecessor, the general conditions of the men's clothing business at that time, and the prospective future earnings of the petitioner.[4]   In arriving at the fair market value of the good will acquired by petitioner from its predecessor in business we have considered the stipulated facts, the exhibits, the testimony of witnesses, in fact, all the evidence, and we have determined a fair market value of $1,000,000.

### *Issue 3 (b)—Borrowed Invested Capital.*

As to Issue 3 (a), respondent concedes that petitioner's equity invested capital should not be reduced in the amount of $171,680 for the fiscal year ending in 1944, as was proposed in the deficiency notice. Since petitioner's earnings and profits for the taxable year exceeded the amount of the distribution (excess of the principal amount of the debentures over the par value of the preferred stock), it is presumed that the distribution is made from earnings and profits of the taxable year.   See section 718 (b) of the Code and Regulations 112, section 35.718–5.

At the hearing respondent filed an amended answer raising Issue 3 (b).   In our Findings of Fact we have described the recapitalization of petitioner which took place on February 3, 1944.   The issue for us to decide is whether petitioner's borrowed invested capital is to be computed by including the debentures therein at their face value, or at the par value of the preferred stock surrendered to petitioner in exchange for the debentures.

Section 719 (a) (1) of the Code provides that borrowed capital shall include, among other things, "The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust."   Respondent contends that the sum of $171,680 here involved is neither borrowed, nor invested, nor capital.   As authority in support of his contention respondent relies on *McKinney Manufacturing Co.*, 10 T. C. 135, and *Columbia, Newberry & Laurens Railroad Co.*, 14 T. C. 154.   These cases hold, relying on section 719 (a) (1) of the Code, that where script or certificates of indebtedness have been issued in lieu of interest the securities retain their character as interest and are not to be included in the taxpayer's borrowed capital under section 719 (a) (1).   Respondent contends that those decisions are controlling here for if that rule is applicable with regard to interest, then it follows that debentures issued in lieu of accumulated dividends on preferred stock retain

---

[4] See Regulations 112, section 35.718–1 for a discussion of the various factors which may be considered in determining fair market value.

their original character as dividends. The extension of the rule established by those two cases relating to accrued interest to the fact situation presented in the instant proceeding we do not think is warranted. Prior to the issuance of script, done in the earlier case, or certificates of indebtedness, done in the latter case, the amount of interest was not includible in the amount of the taxpayers' invested capital.[5] Through the expedient of issuing script and certificates of indebtedness the taxpayers hoped to increase their invested capital by qualifying under the provisions of section 719 (a) (1) of the Code their liability for interest as borrowed capital. In accordance with legislative intent the cases cited by respondent hold that the corporate taxpayer may not convert its liability for interest into borrowed capital for the purpose of computing its excess profits credit. The statute expressly excludes it.

In the instant proceeding, as a consequence of issuing the securities, petitioner is deemed to have distributed out of its earnings and profits for the taxable year ending in 1944, the sum of $171,680, Issue 3 (a), and for all subsequent taxable years petitioner's equity invested capital will be reduced accordingly from what it otherwise would have been, save for the distribution of the $171,680. To the extent of $171,680, therefore, petitioner converted equity invested capital into borrowed capital. There is no statutory prohibition against this practice,[6] in fact, petitioner converted preferred stock of the par value of $429,200 (equity invested capital) into debentures (borrowed capital) by this same recapitalization. Respondent would have us distinguish the face value of debentures arising from the redemption of the canceled preferred stock and the face value of debentures arising from the satisfaction of the accumulated dividends due on the preferred stock, yet in the absence of the recapitalization the earned surplus used to satisfy the accumulated dividends on the preferred stock and the par value of its preferred stock were both includible alike in petitioner's equity invested capital.

Respondent is not sustained as to Issue 3 (b).

### Issue 4—Accrued Interest.

The fourth issue presents a question involving interest income from a promissory note held by petitioner. Respondent contends that petitioner, an accrual basis taxpayer, must include in income the interest due and payable to petitioner as provided under the terms of a note for $175,000. The 10-year note was executed by petitioner's wholly owned subsidiary in 1940. According to the note interest was due and

---

[5] Invested capital is defined in section 715 of the Code.
[6] See: *Tribune Publishing Co.*, 17 T. C. 1228.

payable at the rate of 5 per cent. Petitioner has established, however, that there was a mutual agreement that no interest was to be charged or paid on the note until an undetermined future date to be determined subsequently upon the agreement between the parties to the note that the subsidiary was financially able to pay the interest. The books and the tax returns of both petitioner and the subsidiary were set up on a consistent basis and in accordance with the oral agreement of the promisor and the promisee.

There is no material difference in the issue presented here and the one in *Combs Lumber Co.*, 41 B. T. A. 339. There the taxpayer held demand promissory notes which were executed by the taxpayer's stockholders with the mutual understanding that no interest would be paid or charged thereon, and we held that the taxpayer was not required to accrue interest on the notes as income. In so holding we said, "The important factor in this case is succinctly stated in *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182, 184, wherein we said: 'When the right to receive an amount becomes fixed, the right accrues'."

As to this final issue we think respondent erred in determining that petitioner earned interest income during the fiscal year ending in 1944 in the amount of $8,750 on the note of its subsidiary.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

MURDOCK, LE MIRE, and RAUM, *JJ.*, concur in the result.

ARUNDELL, *J.*, dissents on the first point.